UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 12/15/09

- - - - - - - - - - - - - - - - - - - - - - - - - - x

JOHN PETRUCELLI,                                   :

                 Petitioner,    :

     - against -                                :

UNITED STATES OF AMERICA,          :

                 Respondent.  :

- - - - - - - - - - - - - - - - - - - - - - - - - - x

05 Civ. 9582 (TPG)
02 Cr. 099 (TPG)

**OPINION**

        John Petrucelli, a federal prisoner, has filed a motion pursuant to 28 U.S.C. § 2255 to vacate, set aside, or correct his sentence, or, in the alternative, for a hearing, on the grounds that (1) he was denied his Sixth Amendment right to representation by conflict-free counsel; (2) his representation at trial was ineffective in violation of the Sixth Amendment; (3) the Government improperly withheld impeachment materials for its witnesses in violation of <u>Brady v. Maryland</u>, 373 U.S. 83 (1963), <u>Giglio v. United States</u>, 405 U.S. 150 (1972), and their progeny; and (4) he was deprived of his Sixth Amendment right to effective assistance of counsel because the Government's death penalty case was "illusory from its inception."

        Petrucelli has filed a separate motion to amend his original motion so as to include claims under <u>Brady</u> and <u>Giglio</u>. That motion is granted.

        Petrucelli is represented by new counsel on the § 2255 motion. The Government has answered.

For the reasons set forth hereafter, the § 2255 motion, as amended, is denied.

## BACKGROUND

A:  The Facts

This statement of facts is drawn from the trial record.  Of course, Petrucelli has continued in his not guilty position regarding the murder he has been convicted of.  But the court believes that the evidence supports the conviction, thus the following recitation of the facts.

Throughout the early 1990s, John Petrucelli was a member of the Tanglewood Boys, a violent gang that regularly engaged in murder, armed robbery, burglary, loan sharking, and bookmaking in the Bronx and Westchester County.  The Tanglewood Boys' membership was comprised chiefly of young men who wished to become members of the Luchese Organized Crime Family.

In the early morning of June 20, 1995, Tanglewood Boy member Darin Mazzarella was shot by Michael Zanfardino, an associate of the rival Genovese Family.  Petrucelli witnessed the shooting.  A few hours later, near P.S. 108 in the Bronx, Petrucelli stabbed Paul Cicero, a cousin of a Genovese Family associate, to avenge the shooting of Mazzarella. Sean McKernan, a childhood acquaintance of both Petrucelli and Cicero, saw Petrucelli lunge at Cicero from his position seated on a stoop near P.S. 108, but he did not observe the stabbing because a concrete wall blocked the lower three-quarters of Petrucelli's and Cicero's bodies.  After

Petrucelli left the scene, Cicero passed in front of the stoop where McKernan was sitting and said, "That bastard Johnny just stabbed me" while clutching his stomach. Cicero subsequently bled to death on the operating table at a nearby hospital.

On June 21, 1995, the day after the shooting and stabbing, Steven Crea, the Underboss of the Luchese Family, summoned Petrucelli to a meeting. Crea explained that the Genovese Family had contacted him to prevent the Tanglewood Boys from taking revenge against Zanfardino. Petrucelli informed Crea that he had stabbed Cicero in response to Mazzarella's shooting. Petrucelli then fled to Las Vegas, where he stayed with his grandmother, and later his aunt and uncle, for several weeks.

A few days later, Acting Boss of the Genovese Family, Liborio Bellomo, requested a meeting with Joseph Defede, the Acting Boss of the Luchese Family, to discuss the circumstances surrounding the shooting and stabbing. Bellomo asked Defede to ensure that the Tanglewood Boys not to pursue Zanfardino and argued that the Cicero murder constituted sufficient revenge against the Genovese Family for Mazzarella's shooting. Defede granted Bellomo's request.

In early 1996, after Mazzarella had recovered from his gunshot wounds, he met with Defede to discuss his desire to retaliate against Zanfardino. Defede explained that revenge would be unjustified because of Cicero's murder and instructed Mazzarella not to exact retribution.

Several days later, at Defede's request, Mazzarella and Zanfardino met and formally called a truce.

B: Procedural History

    1) Pre-Trial

On January 28, 2002, Petrucelli was indicted by a federal grand jury on one count of murder in aid of racketeering in violation of 18 U.S.C. § 1959(a)(1).

    a) Production Of Brady/Giglio Material

On February 22, 2002, defense counsel requested that the Government produce all Brady and Giglio material. The Government responded to Petrucelli's request on March 20, 2002, stating that it was unaware of any Brady material and that it would provide Giglio material, to the extent any existed, when it provided prior statements of witnesses under 18 U.S.C. § 3500. On June 21, 2002, Petrucelli's counsel renewed its request for Brady material and asked the court to order production and inspection of this information. The Government opposed the motion on July 12, 2002, reiterating its good-faith representations that there was no Brady material to supply. On October 21, 2002, the court denied Petrucelli's application for court-ordered production and inspection of Brady material.

    b) Plea Offer

Some time in June 2002, Larry Bronson, Esq., who was retained by Petrucelli specifically for the purpose of exploring disposition of the

4

case in advance of trial, contacted AUSA David N. Kelley and asked for a plea offer from the Government. Later that month, AUSA Kelley communicated a plea offer to Bronson on behalf of Petrucelli. At some point prior to trial, Bronson telephoned either AUSA Kelley or AUSA David Raskin and rejected the plea offer.

2) The Trial

Petrucelli's trial commenced on October 21, 2002 and concluded on November 4, 2002. The Government's evidence included: (1) testimony of two cooperating witnesses, Mazzarella and Defede, each of whom was apprised by confidants of Petrucelli's stabbing of Cicero and subsequent flight to Las Vegas, and each of whom became embroiled in extensive negotiations between the Luchese and Genovese Families concerning Mazzarella's right to avenge his shooting; (2) testimony of Sean McKernan, the eyewitness to the stabbing; (3) testimony of Petrucelli's aunt regarding his unannounced stay with her in Las Vegas after the stabbing; (4) records reflecting Petrucelli's failure to reclaim his car after it was seized by the police near the scene of Mazzarella's shooting; (5) testimony and tangible evidence of racketeering activity routinely carried out by the Tanglewood Boys between 1989 and 1997; (6) surveillance photographs of Petrucelli meeting with members of the Tanglewood Boys and the Luchese Family; and (7) testimony of Dr. James Gill, a medical examiner, who reviewed the autopsy report and photographs.

The defense called three witnesses: (1) Dr. Charles Wetli, an expert forensic pathologist, who testified that the shape of Cicero's wound evinced "additional movement" after the knife penetrated the abdomen but that this was not necessarily caused by the attacker; (2) Placido Borruso, the man who received Cicero after the stabbing and called the ambulance, who claimed that Cicero told him "a black guy" stabbed him; and (3) Marvin Specter, a professional engineer and licensed surveyor, who testified about a topographical survey he prepared regarding the sight lines at P.S. 108.

The jury convicted Petrucelli of the sole count in the indictment.

3) Post-Trial

   a) Sentencing and Appeal

On February 7, 2003, this court sentenced Petrucelli to a mandatory term of life imprisonment and directed restitution of $8,000 for Cicero's funeral expenses. On May 12, 2004, Petrucelli's conviction was affirmed by the Second Circuit. See United States v. Petrucelli, 03-1100, 97 Fed. Appx. 355, 360 (2d Cir. May 12, 2004). On July 15, 2004, the Second Circuit denied Petrucelli's petition for rehearing en banc. And on November 15, 2004, the United States Supreme Court denied certiorari.

   b) § 2255 Motion And Brady/Giglio Amendment

Petrucelli filed the instant § 2255 motion on November 5, 2005, and the Government submitted its opposition on January 26, 2007.

On February 7, 2007, while reviewing tape recordings made by former Westchester County District Attorney Jeanine Pirro in connection with an unrelated grand jury investigation, the Government uncovered tapes of a December 18, 1997 conversation between Pirro and Mark Pomerantz, then chief of the criminal division of the United State Attorney's Office for the Southern District of New York ("SDNY"), concerning Mazzarella's involvement in the 1994 murder of Louis Balancio.  At the time of the recording, Mazzarella was under indictment in Westchester County for his role in the murder of Balancio. The indictment was based on information that Mazzarella held Balancio while he was stabbed by another person.  But based on new evidence that one of Mazzarella's Tanglewood Boy confederates, Anthony DiSimone, was in fact responsible for the murder of Balancio, the Westchester County District Attorney's Office ("WCDA") was poised to dismiss the charges against Mazzarella and indict DiSimone instead.  The tape-recorded conversation revealed, however, that Pomerantz, through a wholly separate investigation, became aware of information from an FBI informant suggesting that Mazzarella participated in the murder of Balancio.  Specifically, the informant corroborated the indictment, claiming that Mazzarella told him that he held Balancio down while his brother, Nick Mazzarella, stabbed him.

Pirro and Pomerantz found this new information alarming, particularly because the WCDA was on the verge of announcing

DiSimone's indictment in connection with the Balancio murder.
Moreover, only days earlier, the SDNY had permitted Mazzarella to plead
guilty pursuant to a cooperation agreement to all-encompassing
racketeering charges that did not include the Balancio murder. The
cooperation agreement with the SDNY required Mazzarella to disclose
truthfully his entire criminal history. Pomerantz, however, repeatedly
expressed reservations about the veracity of the information, as it was
obtained only hours earlier from an untested informant and was subject
to further investigation. No other tape recordings on this subject were
located.

In early 1998, less than two months after the tape-recorded
conversation, the WCDA dismissed the charges against Mazzarella for his
role in the Balancio murder, and DiSimone was indicted. At trial in the
Petrucelli case, Mazzarella adamantly denied any involvement in the
Balancio murder.

Upon discovering the tapes in February 2007, AUSA David Raskin
embarked upon an extensive investigation to uncover the explanation for
the information on the tape recordings and the subsequent non-
disclosure in order to determine the effect, if any, on Petrucelli's trial.
The relevant steps are summarized below:

AUSA Raskin first spoke with Mark Pomerantz, who had no
recollection of the calls or even the subject matter of the calls.
Pomerantz was certain, however, that the informant's information to

which he referred on the tape recordings had been investigated appropriately and discredited or else the SDNY would not have adhered to its cooperation agreement with Mazzarella and the WCDA would not have dismissed its charge against Mazzarella.

AUSA Raskin also spoke with Kerry A. Lawrence, the AUSA responsible for Mazzarella's plea and cooperation at the time of the tape recordings. Lawrence had a vague recollection of an issue arising, and then being resolved, in connection with Mazzarella's plea, but he had no memory of the details. Lawrence was sure, however, that the informant information discussed on the tape recordings was investigated fully and determined to be false, otherwise the SDNY would not have maintained its cooperation agreement with Mazzarella.

AUSA Raskin interviewed Special Agent David Calore, the FBI agent responsible for Mazzarella's cases and the investigation of the Balancio murder. Agent Calore had no recollection of the events Pomerantz described on the tape recordings nor did he specifically recall conducting a follow-up interview of an informant on matters referenced in the tape recordings. Agent Calore was confident that had such an interview occurred, he would have been the agent conducting the interview. He also pointed out that the information was invalid on its face because, based on his knowledge of Mazzarella's cases, Nick Mazzarella was not present at the scene of the Balancio murder.

AUSA Raskin had multiple telephone conversations with James A. McCarty, Jr., WCDA's current First Deputy District Attorney, who was responsible for performing a similar investigation into the tape recordings. McCarty's investigation failed to shed any light on the substance of the tape recordings.

On March 17, 2007, AUSA Raskin contacted Mazzarella himself. Raskin asked Mazzarella whether he recalled telling anyone that he had held down Balancio while his brother had stabbed him. Mazzarella replied that he was "a million percent" sure that he never made such a statement. Moreover, Mazzarella reiterated that he did not participate in the murder and that his brother was not even present at the scene of the murder.

AUSA Raskin reviewed all of the pertinent SDNY files concerning Mazzarella and related investigations with no positive results.

Finally, at AUSA Raskin's request, the FBI canvassed its files pertaining to Mazzarella to determine the identity of the informant that Pomerantz described on the tape recordings. The search yielded negative results.

On April 25, 2007, the Government notified Petrucelli of the tape recordings by providing his counsel with a copy of the transcript of the telephone calls.

For the next two months, AUSA Raskin persisted in his investigation into the identity of the informant mentioned on the tape

10

recordings. After pursuing several leads, AUSA Raskin successfully located the informant on the tape recordings, Tim Owen. On May 16, 2007, AUSA Raskin participated in a telephonic interview of Owen. Owen recalled informing the FBI that he heard Mazzarella state that he held down Balancio while Nick Mazzarella stabbed him. When pressed, Owen admitted that he did not learn the information from Mazzarella directly, but rather overheard Mazzarella discussing Nick Mazzarella's involvement in a murder at a party. Moreover, Owen did not hear Mazzarella or anyone else mention Balancio. Instead, Owen simply assumed that the statement related to the Balancio murder because he recalled that Mazzarella had been released recently on bail on the Balancio murder charges.

After interviewing Owen, the Government determined that his recollection was less credible than that reported by Pomerantz on the tape recordings because: (i) Owen only overheard Mazzarella's statement as opposed to having heard it directly; (ii) Owen simply assumed that the statement related to the Balancio murder but did not have any specific evidence linking Mazzarella to the murder; (iii) Owen's assumption had an insufficient basis; and (iv) Owen's claim that he overheard Mazzarella at a party soon after Mazzarella was released on bail on the Balancio charges was inconsistent with the time frame originally reported by Pomerantz on the tape recordings. And based on several accounts, Nick Mazzarella was not present at the scene of the Balancio murder, further

11

undercutting Owen's version of events.  Moreover, if Owen's information had not proved inaccurate, Mazzarella would have been in breach of his cooperation agreement.  Yet the SDNY never accused Mazzarella of violating the terms of his cooperation agreement.  As a result, the Government determined that the information on the tape recordings was unreliable and thus would have been neither favorable nor material to Petrucelli's defense and trial.

On June 1, 2007, the Government provided notice of these additional facts to Petrucelli's counsel and explained that it was the Government's position that no Brady/Giglio violation had occurred in Petrucelli's case.  In light of this new information, on June 28, 2007, Petrucelli moved to amend his § 2255 motion to assert claims for Brady/Giglio violations.  While the Government consented to Petrucelli's amendment, it filed an opposition on the merits on September 13, 2007.  Petrucelli filed an omnibus reply in support of his original § 2255 motion and Brady/Giglio amendment on February 15, 2008.

## DISCUSSION

Petrucelli challenges his conviction under 28 U.S.C. § 2255 on the grounds that (1) he was denied constitutionally effective assistance of counsel because his two trial attorneys had actual conflicts of interest that adversely affected their representation; (2) his trial counsel's performance fell below the constitutionally acceptable standard articulated in Strickland v. Washington, 466 U.S. 668 (1984); (3) the

Government deliberately violated its constitutional obligations under

Brady and Giglio by intentionally suppressing favorable impeachment

evidence in advance of Petrucelli's trial; and (4) the Government's pursuit

of the death penalty was merely a means to bypass the statute of

limitations.  Each of these claims is addressed in turn.

Conflict of Interest

"The right to counsel under the Sixth Amendment entails a

correlative right to representation that is free from conflicts of interest."

United States v. Levy, 25 F.3d 146, 152 (2d Cir. 1994).  A defendant will

have suffered ineffective assistance of counsel in violation of his Sixth

Amendment rights if his attorney has a *per se* conflict, an actual conflict

that adversely affects the attorney's performance, or a potential conflict

that results in prejudice to the defendant.  See Winkler v. Keane, 7 F.3d

304, 307 (2d Cir. 1993).

To prevail on a Sixth Amendment claim based upon the actual

conflict standard, a defendant must show that an actual conflict existed

and then must demonstrate that this conflict adversely affected defense

counsel's performance.  See Mickens v. Taylor, 535 U.S. 162, 171 (2002);

United States v. Schwarz, 283 F.3d 76, 91-92 (2d Cir. 2002).  An actual

conflict between a lawyer and his client exists "when, during the course

of the representation, the attorney's and defendant's interests diverge

with respect to a material factual or legal issue or to a course of action."

Winkler, 7 F.3d at 307.  If the defendant establishes that an actual

13

conflict exists, "he need not prove prejudice, but simply that a 'lapse of representation' resulted from the conflict." United States v. Malpiedi, 62 F.3d 465, 469 (2d Cir. 1995). That is, the defendant must "demonstrate that some plausible alternative defense strategy or tactic might have been pursued, and that the alternative defense was inherently in conflict with or not undertaken due to the attorney's other loyalties or interests." Levy, 25 F.3d at 157. Where a defendant can establish only potential conflict, a showing that a lapse of representation occurred is not sufficient; the defendant must show that he has been prejudiced by counsel's actions. See Winkler, 7 F.3d at 307.

Petrucelli contends that he was deprived effective assistance of counsel because his attorneys Diarmuid White, Esq. and David Breitbart, Esq. suffered from actual conflicts of interest based on their representations of other mob clients who were defendants in the Southern District of New York, the Eastern District of New York, and state courts in New York and Westchester counties. Petrucelli suggests that White's and Breitbart's allegiances to these other clients dictated their trial strategy at the expense of Petrucelli, resulting in a protracted and ineffective cross-examination of Joseph Defede and their failure to pursue several alternative approaches at trial.

Alleged Actual Conflicts

Diarmuid White and David Breitbart were Petrucelli's trial counsel. Petrucelli claims that that White had actual conflicts of interest arising

from his representation of Anthony Santorelli, Alfred Santorelli, Anthony

DiSimone, and Steven Crea.  Petrucelli contends that Breitbart had

actual conflicts stemming from his representation of Christopher

Furnari, Joseph Massino, Louis Daidone, and Liborio Bellomo.

The facts about these alleged representations are as follows:

- <u>Anthony Santorelli</u>:  White represented Anthony Santorelli from approximately 1998 to February 2001 on charges of tampering with physical evidence in connection with the 1994 murder of Louis Balancio.  White represented Santorelli at trial in Westchester County and through all stages of appeal, including the Second Circuit's affirmance of the district court's denial of Santorelli's habeas corpus motion.

- <u>Alfred Santorelli</u>:  White served as Alfred Santorelli's counsel from approximately 1998 to February 17, 1999.  After waiving indictment and pleading guilty to an information charging him with conspiracy to commit assault and loan sharking in aid of racketeering, the district court sentenced Santorelli to 37 months' imprisonment.

- <u>Anthony DiSimone</u>:  White represented DiSimone from roughly November 1999 to February 2003 in connection with his arrest for the murder of Louis Balancio.

- <u>Steven Crea</u>:  Luchese Family Underboss Crea retained White to assist with a New York county extortion case.  Crea was indicted on August 24, 2000, pleaded guilty on March 8, 2004, and was sentenced on May 4, 2004.

- <u>Christopher Furnari</u>:  Breitbart represented Furnari in connection with a habeas corpus petition challenging a New Jersey parole board decision.  The Third Circuit decided the case on July 12, 2000.

- <u>Joseph Massino</u>:  From January 27, 2003 to July 11, 2005, Breitbart represented Massino in two prosecutions in the Eastern District of New York—a racketeering conspiracy involving the Bonanno Family and certain capital offenses.

- <u>Louis Daidone</u>:  In December 2002, Daidone was indicted in the Southern District of New York for murder in aid of racketeering.  He was later convicted and sentenced to life imprisonment in 2004.  There is no indication, however, that Breitbart represented Daidone at any time.

- <u>Liborio Bellomo</u>:  Bellomo, the Acting Boss of the Genovese Family, was indicted in the Eastern District of New York on racketeering charges on February 1, 2002.  On April 7, 2003, Bellomo pleaded guilty and was later sentenced to 48 months' imprisonment on October 21, 2003.  While Breitbart did not file a notice of appearance and, consequently, his name does not appear on the docket sheet, Petrucelli points to evidence that Breitbart was authorized to attend joint defense meetings and is named on numerous pre-trial motions.

This listing does not show any actual conflicts.  Three of the eight items involve representations in matters which were concluded before the Petrucelli trial.  More importantly, there are no instances where Petrucelli has even indicated that White or Breitbart represented someone who had an interest in conflict with the interest which Petrucelli had in his case.  There is simply no showing, in anything approaching a factual, concrete manner, of a conflict between Petrucelli's interest and the interests of these other people.

However, two of the points require discussion.  These are the ones about White's representation of Anthony Santorelli and DiSimone in connection with the murder of Balancio.  That murder was indeed referred to in the Petrucelli trial.  Mazzarella was cross-examined about that murder in order to impeach him on the basis of his criminal acts.  As already noted, Mazzarrella denied any involvement in the Balancio

16

murder. To the extent that White represented Santorelli and DiSimone in the Balancio murder matter, this would, if anything, have led White to make the most vigorous cross-examination of Mazzarella to show that <u>he</u> committed the murder. There was no conflict of interest.

<u>Alleged Potential Conflicts</u>

1) Cross-Examination of Joseph Defede

Petrucelli claims that Breitbart's cross-examination of Joseph Defede, a cooperating witness and convicted Luchese Family Boss, was "entirely irrelevant, adverse, and fatal" to Petrucelli's case because Breitbart elicited evidence from Defede that counsel had attempted to exclude in advance of trial and instead focused the jury's attention on Petrucelli's organized-crime activities. Petrucelli argues that Breitbart's aim was to establish Defede's testimony for future criminal cases in which Breitbart represented other members of organized-crime families.

The Government suggests that rather than tainting the jury, Defede's gruesome description of the violent nature of the Luchese Family and chronicle of the various murders of its own members, including Petrucelli's father, helped cast doubt on Petrucelli's association with the Luchese Family, as it would be highly improbable for Petrucelli to desire admission to the organization responsible for killing his father. Breitbart's cross-examination also served to demonstrate Defede's lack of first-hand knowledge of the Cicero murder, weakening the testimony that incriminated Petrucelli directly. Indeed, Breitbart elicited testimony

showing that while Defede was privy to all Luchese operations, he was wholly unaware of the activities of the Tanglewood Boys, helping to disassociate the two groups and thus Petrucelli's involvement with an allegedly criminal enterprise.  And even though Defede was near the end of his sentence and therefore was not a typical cooperating witness offering testimony in the hopes of receiving leniency, by highlighting the vindictiveness and viciousness of the Luchese Family, Breitbart underscored Defede's desire for witness protection and established his motive to please the Government.

Petrucelli wholly fails to explain how Breitbart's questioning of Defede was beneficial to his alleged Mafia clients.  Petrucelli does not demonstrate for which trials and which clients Breitbart attempted to procure testimony from Defede at the expense of Petrucelli.   Rather, Breitbart waged an effective cross-examination, particularly considering Defede's position as a convicted felon.

2) Alternative Strategies

Petrucelli proposes four alternative strategies that his counsel could have undertaken but decided against pursuing based on their purported allegiance to their other organized-crime clients.  According to this argument, counsel could have: (a) declined to cross-examine Defede and instead characterized his testimony as irrelevant in summation; (b) encouraged Petrucelli to take the stand in his own defense; (c) called

various Mafia witnesses to testify on Petrucelli's behalf; and (d) pursued a plea or cooperation agreement with the Government.

a) Cross-Examination of Defede

Petrucelli first suggests that Breitbart could have chosen to forego cross-examining Defede and instead could have argued in summation that his testimony was irrelevant. The description of this cross-examination given earlier in this opinion shows that the cross had a substantial purpose in the defense case. In any event, it is well-established that the decision to engage in cross-examination and, if so, to what extent and in what manner, is a tactical decision that should not be second-guessed by the courts. See Dunham v. Travis, 313 F.3d 724, 732 (2d Cir. 2002). "Decisions concerning the nature and extent of cross-examination are the type of strategic decisions which, if reasonably made, will not constitute ineffective assistance of counsel." United States v. Castillo, No. 92 Civ. 3982, 1993 WL 51181, at *5 (S.D.N.Y. Feb. 23, 1993). Surely the decision to cross-examine Defede was, to say the least, reasonably made.

b) Taking The Stand

Petrucelli also contends that his counsel's recommendation not to take the stand was motivated by the possibility that his testimony would have implicated other crime figures currently represented by counsel. However, there was ample reason in Petrucelli's own interests to advise him against testifying. The idea that this advice was given because of

19

some conflicting interests, or potential conflicting interests, relating to other crime figures, is entirely speculative and has no substance. And as the Government notes, dissuading Petrucelli from testifying hardly constitutes a lapse in judgment because he would have opened himself up to vigorous cross-examination, including inquiry into two uncharged murders that the defense had convinced the court to exclude. Moreover, Petrucelli does not explain what his testimony would have been and how it would have advanced his case.

c) Mafia Witnesses

This claim is beyond the realm of reason. There is no indication that these people would have agreed to appear, or that an unwilling Mafia leader, needing to be subpoenaed, would have been helpful in any way. There is not the slightest reason to believe that such witnesses would have exonerated Petrucelli or gone any distance toward this result.

d) Plea Agreement

Finally, Petrucelli argues that White and Breitbart failed to pursue a plea bargain out of fear that Petrucelli's potential cooperation and testimony would hurt their other organized-crime clients. Petrucelli's assertion is belied by the record. In June 2002, Petrucelli's former counsel, Larry Bronson, Esq., secured a plea deal, which Petrucelli ultimately rejected. The case was not disposed of by a plea agreement and went to trial, but there is no evidence that this was the result of any

failure on the part of White or Breitbart, or the result of any actual or potential conflict of interest.

Ineffective Assistance of Counsel

Under the standard set forth in Strickland v. Washington, 466 U.S. 668 (1984), a defendant raising a claim of ineffective assistance must show (1) that his attorney's performance "fell below an objective standard of reasonableness," and (2) that prejudice resulted. Id. at 687. "The benchmark for judging any . . . claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." United States v. DiTommaso, 817 F.2d 201, 215 (2d Cir. 1987) (citing Strickland, 466 U.S. at 684-87).

In evaluating the first prong of the Strickland analysis, the court must determine whether counsel provided "reasonably effective assistance" to the defendant, "indulg[ing] a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance," given that effective assistance can come in many forms and acknowledging that even "the best criminal defense attorneys would not defend a particular client in the same way." Strickland, 466 U.S. at 689. Decisions concerning investigation and strategy, including the arguments to stress, witnesses to call, motions to make, and lines of inquiry to pursue, fall squarely within the ambit of trial strategy and, if

reasonably made, cannot support an ineffective assistance claim.  See
United States v. Eisen, 974 F.2d 246, 265 (2d Cir. 1992).

  The second element of the Strickland test requires a showing that
"there is a reasonable probability that, but for counsel's unprofessional
errors, the result of the proceeding would have been different."
Strickland, 466 U.S. at 695.  Indeed, the Second Circuit repeatedly has
proclaimed its "reluctance to second-guess matters of trial strategy
simply because the chosen strategy was not successful."  Trapnell v.
United States, 725 F.2d 149, 155 (2d Cir. 1983).

A. Alleged Inadequacies of Counsel

  Petrucelli argues that White and Breitbart provided ineffective
assistance in violation of his Sixth Amendment right to counsel because
they were derelict in pursuing "obvious and reasonable" defenses,
including:  (1) overlooking evidence readily accessible through a proper
pre-trial investigation; (2) impeding Petrucelli's right to testify; (3)
neglecting to raise a statute of limitations defense; (4) declining to
discuss with Petrucelli the possibilities of pleading guilty or cooperating
with the Government; and (5) failing to conduct an effective cross-
examination of Defede.

  1) Pre-Trial Investigation

  Where allegations of ineffective assistance are conclusory and
give no indication as to what exculpatory evidence may have been
revealed by an investigation, a Sixth Amendment ineffective assistance

claim based on failure to investigate is doomed. See Curry v. Burge, No.
03 Civ. 0901 LAK AJP, 2004 WL 2601681, at *31 (S.D.N.Y. Nov. 17,
2004). Rather, a "petitioner alleging that counsel's ineffectiveness was
centered on a supposed failure to investigate has the burden of providing
the court sufficiently precise information, that is, a comprehensive
showing as to what the investigation would have produced." Halo v.
United States, No. 06 CV 5041 (ARR)(RLM), 2007 WL 1299158, at *13
(E.D.N.Y. Apr. 30, 2007).

Petrucelli asserts that his counsel was ineffective because they
did not conduct an adequate pre-trial investigation. Specifically, he
criticizes his counsel for failing to introduce evidence of a 1997 New York
Police Department report that recounted an interview of a WCDA
investigator who had tracked the Tanglewood Boys and concluded that
they were not an organized criminal enterprise connected to the Luchese
Family. The investigator also stated that his investigation had not
revealed any connection between the Tanglewood Boys and Petrucelli.
Because this information was readily available and accessible, Petrucelli
argues that failing to conduct discovery into the creation of the report
violated his Sixth Amendment right to effective counsel.

But Petrucelli does not allege how further inquiry into this 1997
police report would have bolstered his trial defense, and he makes no
attempt to specify what admissible evidence such an inquiry would have
yielded.

1) Right to Testify

For essentially the reasons articulated earlier, Petrucelli's contention that his counsel prevented him from testifying is insufficient to make a showing of ineffective assistance.

2) Statute of Limitations Defense

Petrucelli suggests that his counsel's performance was deficient because they neglected to raise a statute of limitations defense. This argument is unavailing, however, because based on the Second Circuit's affirmance in this case, a statute of limitations claim would have been futile. See Petrucelli, 97 Fed. Appx. at 359-60.

3) Alternatives to Trial

As established earlier, Petrucelli's former counsel, Larry Bronson, Esq., in fact pursued a plea offer, which Petrucelli declined. There was no alternative to a trial.

4) Defede's Cross-Examination

As evident from the record, Breitbart attempted to discredit Defede within the bounds of the Federal Rules of Evidence. As such, Petrucelli does not show that his counsel's cross-examination of Defede did not fall within the wide range of acceptable professional assistance.

B. Prejudice

Even assuming *arguendo* that counsel performed below an objectively reasonable standard, Petrucelli fails to satisfy the second prong of the Strickland standard. An evaluation of Strickland claims

"usually begins with an examination of the strength of the Government's case." United States v. Helgesen, 669 F.2d 69, 71 (2d Cir. 1982). And, where the evidence of guilt is overwhelming, the court may dispose of the case based on the petitioner's lack of prejudice, without the need to evaluate counsel's performance. See United States v. Reiter, 897 F.2d 639, 645 (2d Cir. 1990).

Here, Petrucelli has failed completely to show that there was a reasonable probability that he would not have been convicted absent his counsel's allegedly deficient representation. The Government presented interlocking evidence of Petrucelli's stabbing of Cicero and other racketeering activity from multiple sources. In fact, the court took particular note of defense counsel's performance in the face of overwhelming evidence of Petrucelli's guilt:

> I want to say that it is not my practice to deliver lectures at the time of sentencing . . . The defense attorneys did their best in presenting that evidence and in presenting their cross-examination and their arguments and whatever else they presented. But I would like to say . . . that I believe that the jury's verdict was absolutely justified. I believe that the Government's proof showed that Mr. Petrucelli committed this crime and that the proof was beyond a reasonable doubt.

Sentencing Tr., dated February 7, 2003, at 10-11. Because Petrucelli fails to allege, let alone establish, how the result of his case would have been different had any of his laundry list of shortcomings been corrected, there is no basis for finding that his attorneys acted unreasonably, or that any prejudice resulted from their actions. See Vasquez v. United States, No. 96 CIV. 2104 (PKL), 1996 WL 694439, at *7 (S.D.N.Y. Dec. 3,

1996) (dismissing ineffective assistance claim where petitioner's
"allegations [we]re vague, conclusory, and unsupported by citation to the
record, any affidavit, or any other source" and finding that petitioner
failed to demonstrate that but for the charged errors, the result would
have been different). Therefore, because Petrucelli's complaints about
his trial counsel's performance do not satisfy the strict criteria of
Strickland, his Sixth Amendment claim in this regard has no merit.

Withholding Brady/Giglio Material

To succeed on a Brady/Giglio claim, it must be shown that: (1) the
Government failed to disclose favorable evidence, and (2) the evidence it
suppressed was "material." See United States v. Payne, 63 F.3d 1200,
1208 (2d Cir. 1995). Undisclosed information "is deemed material so as
to justify a retrial only if there is a reasonable probability that, had it
been disclosed to the defense, the result of the proceeding would have
been different." United States v. Spinelli, 551 F.3d 159, 164-65 (2d Cir.
2008). For example, impeachment evidence is not material if the
testimony of the witness was corroborated or when the suppressed
evidence "merely furnishes an additional basis on which to impeach a
witness whose credibility has already been shown to be questionable."
Payne, 63 F.3d at 1210.

Petrucelli argues that the Government impermissibly suppressed
information about Mazzarella learned from informant Tim Owen in
December 1997 that was both favorable to Petrucelli and material to the

26

jury's finding of guilt. Based on the Government's investigation into Owen's account, however, it appears that Owen's version of events proved untrustworthy and was discredited by members of the SDNY, WCDA, and FBI after being vetted exhaustively. As such, Owen's information could hardly have had an overwhelming effect on the jury.

But even assuming the accuracy of Owen's information, Petrucelli cannot establish that its absence from his trial undermined confidence in the verdict. At trial, the Government elicited from Mazzarella his prior criminal conduct and bad acts. Mazzarella admitted that had pleaded guilty to participating in the Tanglewood Boys' racketeering enterprise and to committing multiple racketeering acts in furtherance of the enterprise, including murder, armed robbery, burglary, assault, extortion, loan sharking, and gambling. And Mazzarella in fact testified about the Balancio murder, acknowledging that he was part of the brawl that resulted in the killing of Balancio but stated that he himself did not participate in the stabbing. On cross-examination, Breitbart used all of this impeachment material to impugn Mazzarella's credibility by highlighting his motive for cooperation, his extensive Mafia ties, and his aggressive, violent behavior. At most, the information concerning Owen's knowledge of Mazzarella's alleged participation in the Balancio murder might have caused Breitbart to ask Mazzarella a few more impeaching questions. But cumulative impeachment information is neither material nor prejudicial in the Brady/Giglio context.

27

In sum, Petrucelli had ample ammunition with which to attack the credibility of Mazzarella, and he did.  Accordingly, the Government did not violate its duty to disclose under <u>Brady</u> and <u>Giglio</u>, so no habeas relief is warranted.

<u>Government's Pursuit of the Death Penalty</u>

Petrucelli states in conclusory fashion that even though the Government knew that it "could never obtain the death penalty in this case," it sought such remedy merely to circumvent the statute of limitations.  But Petrucelli's claim is entirely meritless because he was charged under a statute that does impose a statute of limitations.  <u>See</u> 18 U.S.C. § 1959(a)(1); <u>see also</u> 18 U.S.C. § 3281 (stating that an "indictment for any offense punishable by death may be found at any time without limitation.").  As the Second Circuit held on appeal, "irrespective of whether the death penalty was sought . . ., [Petrucelli's] crime was properly characterized as being punishable by death simply because the death penalty was authorized by the statute under which [Petrucelli] was charged." <u>Petrucelli</u>, 97 Fed. Appx. at 359.  Thus, there was no due process violation in pursuing the death penalty.

## CONCLUSION

Petrucelli's § 2255 motion is without merit and is denied.[1]

Because he has failed to make a substantial showing of the denial of a

---

[1] Merely filing a § 2255 motion "does not entitle petitioner automatically to a hearing." <u>Newfield v. United States</u>, 565 F.2d 203, 207 (2d Cir. 1977).  To warrant an evidentiary hearing, a habeas petitioner must raise detailed and controverted issues of fact

constitutional right, a certificate of appealability will not issue. The court

certifies pursuant to 28 U.S.C. § 1915(a)(3) that any appeal from this

order would not be taken in good faith.

Dated: New York, New York
      December 15, 2009

SO ORDERED

_____
Thomas P. Griesa
U.S.D.J.

---

supported by competent evidence, which, if proved, entitle him to relief. See United
States v. Aiello, 814 F.2d 109, 113 (2d Cir. 1987). In light of the foregoing discussion of
Petrucelli's arguments and new evidence, he has not met this burden.